[Cite as *State v. McDonald*, **2023-Ohio-1987**.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220328<br>TRIAL NO. B-2102431 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| ROBERT MCDONALD, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 16, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson,* Assistant Public Defender, for Defendant-Appellant.

**KINSLEY, Judge.**

**{¶1}** Defendant-appellant Robert McDonald appeals his conviction for voluntary manslaughter and an accompanying weapon specification, arguing that the weight of the evidence presented at trial established that he had acted in self-defense when shooting, and ultimately killing, De'Angelo Amison.

**{¶2}** While McDonald was entitled to a presumption that he acted in self-defense, the weight of the evidence did not establish that he had a bona fide belief that he was in imminent danger of death or great bodily harm necessitating the use of deadly force. We therefore reject McDonald's argument that his conviction was contrary to the manifest weight of the evidence. We additionally hold McDonald's challenge to the trial court's application of the Reagan Tokes Law to be without merit, and we affirm the trial court's judgment.

### *Factual and Procedural Background*

**{¶3}** Amison was shot and killed inside an apartment belonging to Laneasha Walker on May 6, 2021. For his role in Amison's death, McDonald was indicted on charges of murder, voluntary manslaughter, and felonious assault. Each charge carried two accompanying weapon specifications. At a bench trial, McDonald conceded that he shot Amison, but argued that he had acted in self-defense.

**{¶4}** Before discussing the testimony presented at trial, it is helpful to explain the relationships between the various persons involved in this case. Laneasha Walker, whose apartment was the scene of the shooting, was dating McDonald. Walker was Amison's former girlfriend, the mother of his child, and, at the time of his death, pregnant with Amison's second child. Walker resided in the same apartment building as Amison's mother, sister, and aunt, living on the floor directly above them. Tamara

Wallace was a witness to the events surrounding the shooting. Wallace was Amison's girlfriend, but had previously been in a relationship with McDonald, who is the father of her child.

{¶5} The following evidence was presented at trial concerning McDonald's shooting of Amison and whether he acted in self-defense. All witnesses were consistent in their testimony that Amison and Walker had argued with each other, resulting in Amison entering Walker's apartment to confront her and subsequently being shot by McDonald.

{¶6} Antonia Conyers, Amison's younger sister, testified that, after hearing commotion on the floor above, she went upstairs and stood in the hallway outside of Walker's apartment. The front door of the apartment was open, and Conyers saw Walker and Amison arguing. Conyers's testimony placed Walker and McDonald next to each other, with Amison facing them. She saw Amison move closer to Walker, and Walker whisper something to McDonald in response. According to Conyers, she then saw McDonald holding a gun. When asked where the gun came from, she responded, "I don't know. He had it on the side of him." Conyers testified that McDonald aimed the gun at Amison and explained that after Amison was shot, he started screaming and ran down the stairs to their mother's apartment.

{¶7} Latoya Adams, Amison's aunt who lived on the floor below Walker, observed Amison and Walker arguing in the hallway of the apartment complex on the morning of the shooting. She saw Walker spit on Amison from the landing above, which prompted Amison to run up the stairs and kick open the door to Walker's apartment. Adams testified that she walked upstairs and viewed the altercation that occurred inside Walker's apartment from her position in the hallway.

{¶8} Adams explained that Amison stood directly in front of Walker, who was lying back on a couch, and that McDonald was standing to the left of Amison. According to Adams, she heard Amison state, "B****, you spit on me, like that's assault like, I should beat your a**." Adams testified that Amison placed himself directly in Walker's face while pointing and yelling at her, but that he never struck her. According to Adams, Walker responded to Amison's threat by pointing at McDonald and stating, "You always want to try to put your hands on a female, fight him." Adams heard Walker tell Amison to "fight a n*****." She then saw Amison turn around and point at McDonald while asking, "Who, this n*****?" and "What you going to do n*****?" Adams testified that while Amison was making these statements, McDonald pulled out a gun and shot Amison in the chest.

{¶9} Wallace testified that on the morning of the shooting, she and Amison went to Walker's apartment so that Amison could pick up his son. According to Wallace, she waited at the bottom of the stairs inside the apartment complex for Amison, who came back downstairs without his son and on a quest to find diapers, which he apparently needed to retrieve before taking the child. Frustrated by the inability to just pick up his son, Amison abandoned the search for diapers and went back upstairs, where he kicked open the door to Walker's apartment and charged at Walker and McDonald. Wallace explained that she also went upstairs, where she watched events unfold from the doorway into the apartment.

{¶10} Wallace testified that she saw Walker jump onto the couch in a balled-up position and ask McDonald for help after Amison charged her. According to Wallace, Amison argued with Walker, and it looked like he was choking her, but Wallace conceded that she never saw Amison physically touch Walker. She heard

4

Amison ask McDonald, "What are you gonna do?" before running up on McDonald and getting in his face. Wallace testified that she then heard a gunshot, but that she had not seen anyone pull out a gun.

{¶11} Walker testified that although Amison had at times stayed at her apartment, he was living with Wallace at the time of the shooting. That morning, Amison had come to pick up their son, but Walker told him he first needed to obtain a car seat for the child. Walker explained that she and Amison were arguing in the hallway when Amison got upset, ran up the stairs, and kicked open the door to her apartment that she had just shut. According to Walker, she was backed up onto her couch, while Amison stood in front of her "looking like he wanted to do [her] some s***." Walker asked McDonald to grab Amison and get him out of her face. Amison heard Walker's plea for help, and he responded, "What the f*** he gonna do? He ain't gonna do s***." Walker testified that Amison then "went towards [McDonald's] way," and she heard a pop. She immediately cursed at McDonald and asked him why he had shot Amison.

{¶12} Walker stated that although Amison had been physically violent with her in the past, he did not put his hands on her while they were arguing in the apartment, nor did he brandish a weapon during the altercation. She stated that McDonald did not seem afraid of Amison that day, although she acknowledged that Amison had threatened McDonald on other occasions.

{¶13} McDonald did not testify at trial, but the state played a video of his interview with the investigating detectives for the court. McDonald stated during the interview that on the morning of the shooting, Amison had come over to Walker's apartment to get his son. Amison initially left without the child, but came back shortly

thereafter and kicked down the door to Walker's apartment. McDonald explained that after entering the apartment, Amison went straight towards Walker and started choking her on the couch. Amison then charged towards McDonald, asking, "What you gonna do?" McDonald stated that he shot Amison because he did not think he had the opportunity to leave the apartment and because Amison had threatened him and charged him, despite seeing that McDonald had a gun. McDonald told the detectives that Amison had threatened him in the past, but that he had not taken the threats seriously.

{¶14} The trial court found McDonald not guilty of murder, but guilty of voluntary manslaughter and felonious assault, along with the accompanying weapon specifications. The offenses of voluntary manslaughter and felonious assault were merged at sentencing, as were the two weapon specifications for the voluntary manslaughter offense. Applying the Reagan Tokes Law, the trial court imposed an indefinite sentence of eight to 12 years' imprisonment for the offense of voluntary manslaughter, along with a consecutive three years of imprisonment for the weapon specification, resulting in an aggregate sentencing of 11 to 15 years in prison.

### *Self-Defense Analysis*

{¶15} In his first assignment of error, McDonald argues that his conviction was contrary to the manifest weight of the evidence. He does not challenge any of the underlying elements of his voluntary-manslaughter conviction, but rather argues that the weight of the evidence established that he acted in self-defense.

{¶16} When reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest

miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). This court recently clarified its role in a manifest-weight review, explaining:

> When faced with a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce enough evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence—which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387-388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this respect. *Id.*

*State v. Gibson*, 1st Dist. Hamilton No. C-220283, 2023-Ohio-1640, ¶ 8.

{¶17} To establish self-defense in the use of deadly force, a defendant must show that: "(1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or

7

avoid the danger." *State v. Wilson*, 1st Dist. Hamilton No. C-210535, 2022-Ohio-3801, ¶ 10, quoting *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 48.

{**¶18**} Under Ohio's recently amended self-defense law, "if there is evidence presented at trial that tends to support that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another." *Gibson* at ¶ 10, quoting *Smith* at ¶ 49. The defendant has the initial burden of producing evidence that is legally sufficient to establish that the defendant acted in self-defense. *Messenger*, Slip Opinion No. 2022-Ohio-4562, at ¶ 25. Once the defendant meets that burden, the state then bears the burden of persuasion to disprove at least one of the foregoing elements of self-defense beyond a reasonable doubt. *Gibson* at ¶ 10. "[A] manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger* at ¶ 26.

{**¶19**} In certain situations, a defendant is entitled to a presumption that the defendant acted in self-defense. Pursuant to R.C. 2901.05(B):

(2) Subject to division (B)(3) of this section, a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

(3) The presumption set forth in division (B)(2) of this section does not apply if either of the following is true:

8

(a) The person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.

(b) The person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.

R.C. 2901.05(B)(2) and (3). When this presumption applies, the defendant's burden to produce evidence that he was not at fault, that he had a reasonable belief of imminent danger of which the only means of escape was the use of force, and that he had no duty to retreat is negated. *State v. Jones*, 2022-Ohio-3162, 195 N.E.3d 561, ¶ 19 (2d Dist.). This presumption is rebuttable, "and may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt." R.C. 2901.05(B)(4).

**{¶20}** Here, the state concedes that the evidence gave rise to a rebuttable presumption that McDonald acted in self-defense, as he was lawfully in Walker's apartment when he shot Amison, who had unlawfully, and without the privilege to do so, entered the residence. *See* R.C. 2901.05(B). The state, therefore, had to rebut the presumption by a preponderance of the evidence while still maintaining the burden to prove beyond a reasonable doubt that McDonald did not act in self-defense. R.C. 2901.05(B)(4); *Jones* at ¶ 18 (holding that when a defendant is entitled to a presumption that he acted in self-defense, "the prosecution may rebut it by a preponderance of the evidence and then prove beyond a reasonable doubt that the defendant did not act in self-defense").

**{¶21}** The state further concedes that McDonald was not at fault in creating the violent situation and that he did not violate any duty to retreat or avoid the danger,

9

but it contends that it established beyond a reasonable doubt that McDonald did not have a bona fide belief that he was in imminent danger of death or great bodily harm. With respect to this element, we have explained that it involves both objective and subjective considerations, stating:

> A defendant's belief that she was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that she sat in such danger. "[I]f the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger." The state may disprove self-defense by demonstrating that the defendant's belief was not objectively reasonable or that she did not have an honest subjective belief that she faced imminent death or great bodily harm.

(Internal citations omitted.) *Wilson*, 1st Dist. Hamilton No. C-210535, 2022-Ohio-3801, at ¶ 13.

**{¶22}** The uncontested evidence established that Amison kicked open the door to Walker's apartment and confronted Walker, placing himself directly in her personal space. The trial court heard evidence, via McDonald's statement during his interview with detectives, that Amison choked Walker on the couch. But in contravention to McDonald's statement was the testimony from Adams, Wallace, and Walker that although Amison charged Walker and got in her face, he never physically touched her. And while the evidence established that Amison turned towards or charged towards McDonald, no witness testified that Amison had a weapon on his person or that he actually touched or attacked McDonald.

{¶23} As the trier of fact, the trial court was in the best position to judge the credibility of the witnesses. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Shepard*, 1st Dist. Hamilton No. C-190747, 2021-Ohio-964, ¶ 62. If the court found credible the testimony that Amison did not touch Walker or McDonald, as well as the evidence that Amison was unarmed, it could reasonably have concluded that McDonald did not have a reasonable belief that he was in imminent danger of death or great bodily harm.

{¶24} On this evidence, the trial court could also have reasonably determined that McDonald's use of deadly force was greatly disproportionate to any potential harm he faced. While McDonald had been threatened by Amison on previous occasions and was aware that Amison had hit Walker in the past, Amison on this occasion was nonetheless unarmed and engaged in no physical violence against either of them prior to being shot.

{¶25} We therefore cannot say that the trial court clearly lost its way or created a manifest miscarriage of justice in determining that the state proved beyond a reasonable doubt that McDonald did not have a reasonable belief that he was in imminent danger of death or great bodily harm and that the only means of escape was the use of deadly force.

{¶26} We hold that McDonald's conviction for voluntary manslaughter was not against the manifest weight of the evidence and overrule the first assignment of error.

### *Reagan Tokes Law*

{¶27} In his second assignment of error, McDonald argues that the trial court erred in sentencing him as a matter of law. Under this assignment, he contends that

the Reagan Tokes Law is unconstitutional because it violates the separation-of-powers doctrine, both substantive and procedural due process, and the Equal Protection Clause.

**{¶28}** McDonald acknowledges that this court has previously held the Reagan Tokes Law to be constitutional, explaining that the challenges were being asserted to preserve them should the Ohio Supreme Court reach a different determination regarding the constitutionality of the law.

**{¶29}** As McDonald concedes, we have rejected these same challenges to the Reagan Tokes Law in *State v. Guyton*, 1st Dist. Hamilton No. C-190657, 2022-Ohio-2962, *appeal allowed*, 168 Ohio St.3d 1418, 2022-Ohio-3752, 196 N.E.3d 850. On the authority of *Guyton*, McDonald's second assignment of error is overruled.

**{¶30}** Having overruled McDonald's assignments of error, we accordingly affirm the trial court's judgment.

Judgment affirmed.

**BERGERON, P.J.,** and **BOCK, J.,** concur.

Please note:
   The court has recorded its own entry on the date of the release of this opinion.